NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0321n.06

No. 08-2199

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

**FILED**
May 16, 2011
LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

RENE BUENTELLO,

    Defendant-Appellant.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF MICHIGAN

_____/

Before:      BATCHELDER, Chief Judge; MARTIN and SUTTON, Circuit Judges.

BOYCE F. MARTIN, JR., Circuit Judge. Rene Buentello appeals his convictions for conspiring to assist illegal aliens in obtaining Michigan driver's licenses, and transferring identification documents with the intent to aid or abet unlawful activity. Because the jury's verdict was supported by substantial evidence we **AFFIRM** Buentello's convictions. Also, we hold that the district court did not abuse its discretion by allowing the United States to admit evidence that Buentello's employer had sanctioned him for participating in the charged crimes at work.

**I.**

The son of migrant workers, Buentello was born in Texas and commuted between Texas and Michigan as his parents traveled in search of work. Buentello's parents strongly believed in education and permanently relocated to Michigan so that Buentello would not be continually

removed from school. Buentello graduated from high school and went on to attend the University of Michigan where he received a Bachelor of Arts degree.

Buentello became involved in education and, specifically, issues facing the children of migrant workers. At the time of the alleged offense, Buentello worked for the Fulton Schools in Middleton, Michigan as the coordinator of its adult basic education and English as a Second Language courses. As part of Buentello's duties, he performed free translations for students enrolled in the program on Fulton Schools letterhead.

In 2004, one of Buentello's students introduced him to Francisco Chavez-Sebastian. Chavez-Sebastian told Buentello that he had friends who had moved to the area in search of work, and asked Buentello if they could have their driver's licenses mailed to Buentello's home. Buentello testified that he believed the individuals applying for licenses were living in a camp for migrant workers that only had one communal mailbox for all residents. Because the communal mailbox was not secure, Buentello agreed to receive the licenses for these individuals at his home. When the licenses arrived, Buentello called Chavez-Sebastian who came and retrieved them. Later, Chavez-Sebastian began bringing individuals to the Fulton Schools so that Buentello could translate documents for them.

Officials at the Michigan Secretary of State's office began to notice an increase in driver's license applications from out-of-county applicants and grew suspicious. Many of these applications were accompanied by documents translated by Buentello on Fulton Schools stationary and listed Buentello's home address as the applicant's residence. Agents from Immigration and Customs Enforcement had been conducting a parallel investigation into the same group of people and combined their investigation with the Secretary of State's.

Immigration and Customs Enforcement agents interviewed Buentello, who stated that he permitted six or seven individuals to have their licenses mailed to his residence. However, Buentello stressed that he was unaware the individuals were not Michigan residents, and did not know that they listed his home address as their residence on their driver's license applications. Buentello also stated that he had agreed to translate documents for friends of Chavez-Sebastian. The Secretary of State's office had previously informed Buentello that it would not accept his translations unless the individuals were students in his class, so he stated that he had enrolled these individuals in his English as a Second Language class. However, very few ever attended class.

During the investigation, agents met with Buentello's supervisor at the Fulton Schools, Philip Garcia, to discuss Buentello's conduct. After the Fulton Schools became aware of Buentello's conduct, it fined him $5,800 for misuse of materials and supplies and required him to submit a letter of resignation.

At trial, the United States presented several witnesses including two of Buentello's co-defendants, Nathaniel Harkness and Jacqueline Enriquez-Aguiree. Harkness and Enriquez-Aguiree described the scheme whereby they worked with Chavez-Sebastian to bring aliens from New Jersey to Michigan to get driver's licenses. At the time, Michigan did not require proof of United States citizenship to obtain a driver's license, but New Jersey did. Harkness and Enriquez-Aguiree testified that they were aware that Buentello translated documents for many of these individuals. Enriquez-Aguiree further stated that the applicants paid Buentello fifty dollars for each document he translated.

The district court denied Buentello's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The jury convicted Buentello of conspiracy to assist illegal aliens

in obtaining Michigan driver's licenses and transferring identification documents with the intent to aid or abet unlawful activity in violation of 18 U.S.C. § 1028(a)(7). Buentello then filed a motion for judgment of acquittal or, in the alternative, a new trial, which the district court denied.

## II.

Buentello argues that the United States introduced insufficient evidence to support his conviction. We review de novo whether there is sufficient evidence to support a conviction. *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006). Viewing the evidence in a light most favorable to the United States, we consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999) (internal quotations omitted). In evaluating the sufficiency of the evidence, we may not independently weigh the evidence or judge the credibility of witnesses. *United States v. Howard*, 621 F.3d 433, 460 (6th Cir. 2010).

### A.    Conspiracy charge.

To establish that Buentello engaged in the conspiracy to unlawfully produce and transfer identification documents, the United States must "prove an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy." *United States v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008) (internal quotations omitted). Harkness and Enriquez-Aguiree, co-defendants who testified on behalf of the United States, described in detail the scheme by which they brought individuals from New Jersey to Michigan to get driver's licenses, had

Buentello perform translations, and had some of the licenses mailed to Buentello's residence. Based on this and the other evidence introduced at trial, the jury's conclusion that Buentello participated in the conspiracy is supported by sufficient evidence.

We recognize that Buentello's background serving the community and the needs of migrant workers arguably constitutes some evidence suggesting that he may not have intended to join or participate in the conspiracy. Similarly, Buentello's initial, substantial cooperation with the investigation also casts some doubt on whether he had knowingly joined the conspiracy. However, we cannot weigh the evidence or attempt to judge the credibility of witnesses from the printed transcript. Although the explanation Buentello offers for what took place suggests that he was not culpable, the jury did not accept it. Therefore, viewing the evidence in a light most favorable to the United States, and recognizing that the conviction may be supported merely by circumstantial evidence, rational jurors could have easily concluded that Buentello participated in the conspiracy, and we affirm his conviction.

**B.      Transferring identification documents in connection with unlawful activity charge.**

Buentello also argues that the United States did not introduce sufficient evidence to support his conviction for violating 18 U.S.C. § 1028(a)(7). Consistent with the requirements in subsection (c) of this statute, section 1028(a)(7) prohibits:

> knowingly transfer[ring], possess[ing], or us[ing], without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law.

The United States introduced evidence that Buentello received driver's licenses for individuals who were not Michigan residents and transferred those identification documents to Chavez-Sebastian. The government also introduced evidence that Buentello's receipt of these documents was in connection with the aliens' false certifications to the Secretary of State. It is a felony under Michigan law to make a false certification in applying for a driver's license.[1] Mich. Comp. Laws § 257.903 (West 2010). Therefore, the United States introduced sufficient evidence to support the jury's verdict that Buentello violated section 1028(a)(7).

Section 1028 was originally enacted in 1982 to create offenses for counterfeiting and trafficking in federal, state, local, and foreign identification documents. H.R. Rep. 97-802, at 1 (1982). Over time, the statute has been amended to include provisions criminalizing various aspects of identity theft. As part of these amendments, Congress added subsection (a)(7) in the Identity Theft and Assumption Deterrence Act of 1998. Pub. L. 105-318, § 3, 112 Stat. 3007, 3007. Buentello is correct that in order to combat identity theft, the statute might make more sense if its scope were limited to imposing liability when an identification document is transferred in connection with a future crime. In contrast, here, the alleged unlawful activity took place in procuring the identification documents before the transfer. Based on these facts, Buentello's conduct might fit more squarely within the prohibition in subsection (a)(2) of "knowingly transfer[ring] an

---

[1]Buentello argues that his conviction under section 1028(a)(7) must be overturned because he did not personally make a false certification. However, section 1028(a)(7) does not require that the individual who transfers the identification document be the one to commit a felony. All the statute requires is that the transfer be in connection with some unlawful activity that is a felony. Therefore, because Buentello transferred the driver's licenses in connection with the aliens' false certifications, it is immaterial that Buentello did not himself commit the underlying false certification felony.

identification document, authentication feature, or a false identification document knowing that such document or feature was stolen or produced without lawful authority." 18 U.S.C. § 1028(a)(2). However, the United States did not indict Buentello under subsection (a)(2), but instead relied on an expansive interpretation of (a)(7).

While subsection (a)(7) may not be the most natural fit for Buentello's conduct, section 1028 is concerned with many different aspects of the improper use of identification documents and not solely identity theft. Even if we might wonder whether Buentello's conduct was the precise type of activity Congress intended subsection (a)(7) to prevent, the plain language of the statute is drafted such that it does not require that the unlawful activity take place after the transfer. Therefore, this construction is consistent with the terms of the statute. For the same reasons that we conclude Buentello's conspiracy conviction was supported by substantial evidence, we also find that the United States presented sufficient evidence to support Buentello's conviction under section 1028(a)(7).

**III.**

Buentello also argues that the district court erred by allowing the United States to admit testimony about the disciplinary proceedings and fine Fulton Schools imposed on him after discovering that he had been improperly providing translated documents on school letterhead. We review evidentiary rulings under the abuse of discretion standard. *United States v. Seymour*, 468 F.3d 378, 386 (6th Cir. 2006).

The district court denied Buentello's motion in limine to exclude evidence of alleged school policy violations. However, the discussion of this issue during trial indicates that the district court

had directed the parties to avoid referencing violations of school policy. The United States complied with this request, but defense counsel's re-cross-examination of Garcia, Buentello's supervisor, left the jury with the incorrect impression that the school condoned Buentello's actions. Buentello argues that Federal Rule of Evidence 404(b) prohibits the introduction of evidence that he violated school policies. *See* Fed R. Evid. 404(b). However, when a party "open[s] the door" on an issue, the district court has discretion to allow evidence on the same issue "to rebut any false impression that might have resulted from the earlier admission." *United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994). The re-cross-examination of Garcia left the jury with the impression that Fulton Schools approved of Buentello's actions. However, Fulton Schools had actually sanctioned Buentello. Because Buentello's counsel deliberately elicited this testimony, the district court was within its discretion to allow the United States to respond and correct the misconception Buentello's counsel had created.

This evidence was still properly admitted even though the district court incorrectly justified admitting the evidence by relying on the *res gestae* exception to the bar on character evidence. "[B]ackground or *res gestae* evidence consists of those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). This evidence does not implicate the bar on character evidence in Rule 404(b). *Id.* However, the concerns that prompted Rule 404(b) are very real, and a party may not rely on this exception as a backdoor to circumvent its goals. To be properly admitted as background evidence, the evidence must have "a causal, temporal or spatial connection with the charged offense." *Id.* "Typically, such evidence is

a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *Id.* With this in mind, we doubt that Garcia's testimony could have been admitted as background evidence. Particularly in light of other evidence that Buentello had performed translations on Fulton Schools stationary, evidence that he had been sanctioned by his employer would not have been necessary to prove that Buentello had committed any of the charged offenses. However, because this evidence was properly admitted to correct the misleading impression that Buentello's counsel created, we nonetheless affirm the district court's decision to allow the United States to present this evidence.

Admitting this evidence did not run afoul of Rule 403. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. In reviewing a district court's decision to admit evidence over a Rule 403 objection we take the "'maximal view of the probative effect of the evidence and a minimal view of its unfairly prejudicial effect.'" *United States v. Foster*, 376 F.3d 577, 592 (6th Cir. 2004) (quoting *United States v. Sassanelli*, 118 F.3d 495, 498 (6th Cir. 1997)). Although prejudicial, this evidence was highly probative, particularly in light of the misleading impression left after the re-cross-examination of Garcia. Therefore, the district court did not abuse its discretion in admitting this evidence.

**IV.**

We hold that the Buentello's conviction was supported by sufficient evidence and the district court did not err by admitting evidence that Buentello had been sanctioned for his conduct by the Fulton Schools. Therefore, we **AFFIRM** Buentello's conviction.